**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

DANIEL HALL McWILLIE,

        Plaintiff,

v.                                        No. 12-cv-00378 CG

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,

        Defendant.

<u>**MEMORANDUM OPINION AND ORDER**</u>

      **THIS MATTER** comes before the Court on Plaintiff's *Motion to Reverse and Remand for a Rehearing, with Supporting Memorandum* ("Motion"), (Doc. 18), *Defendant's Response to Plaintiff's Motion to Reverse and Remand for Rehearing* ("Response"), (Doc. 20), and *Plaintiff's Reply to Defendant's Response to Plaintiff's Motion to Remand to Agency* ("Reply"), (Doc. 21).  The parties consented to have the undersigned magistrate judge conduct all proceedings and enter final judgment.  (Docs. 4, 7).

      The Court has reviewed Plaintiff's Motion, Defendant's Response, the Reply, and the relevant law.  Additionally, the Court has meticulously reviewed and considered the entire administrative record ("AR").  Because the Commissioner did not apply the correct legal standards and some of his findings are not supported by substantial evidence, pursuant to 42 U.S.C. § 405(g) (sentence four), the Court will **GRANT** Plaintiff's Motion and **REMAND** the case for further proceedings consistent with this Memorandum Opinion and Order.

     **I.**     **Standard of Review**

      The standard of review in a Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether the correct legal standards were applied.  *Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008) (citing *Hamilton v. Sec'y of*

*Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992)).  If substantial evidence

supports the Administrative Law Judge's ("ALJ") findings and the correct legal standards were

applied, the Commissioner's decision stands and the plaintiff is not entitled to relief.  *Langley v.*

*Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214

(10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003).  A court should

meticulously review the entire record but should neither re-weigh the evidence nor substitute

its judgment for that of the Commissioner.  *Hamlin*, 365 F.3d at 1214; *Langley*, 373 F.3d at

1118.  A court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g),

which generally is the ALJ's decision, not the Appeals Council's denial of review.  20 C.F.R. §

404.981; *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214;

*Doyal*, 331 F.3d at 760.  An ALJ's decision "is not based on substantial evidence if it is

overwhelmed by other evidence in the record or if there is a mere scintilla of evidence

supporting it."  *Langley*, 373 F.3d at 1118; *Hamlin*, 365 F.3d at 1214.  While a court may not

re-weigh the evidence or try the issues *de novo*, its examination of the record as a whole must

include "anything that may undercut or detract from the ALJ's findings in order to determine if

the substantiality test has been met."  *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir.

2005).  "The possibility of drawing two inconsistent conclusions from the evidence does not

prevent [the ALJ]'s findings from being supported by substantial evidence."  *Lax v. Astrue*, 489

F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir.

2004)).

## II.    Applicable Law and Sequential Evaluation Process

For purposes of disability insurance benefits (DIB) and supplemental security income (SSI), a person establishes a disability when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A), 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a). In light of this definition for disability, a five-step sequential evaluation process (SEP) has been established for evaluating a disability claim.  20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  At the first four steps of the SEP, the claimant has the burden to show that: (1) he is not engaged in "substantial gainful activity;" that (2) he has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; and either (3) his impairment(s) either meet or equal one of the "Listings"[1] of presumptively disabling impairments; or (4) he is unable to perform his "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(i–iv), 416.920(a)(4)(i–iv); *Grogan*, 399 F.3d at 1261.  At the fifth step of the evaluation process, the burden of proof shifts to the Commissioner to show that the claimant is able to perform other work in the national economy, considering his residual functional capacity, age, education, and work experience.  *Id.*

## III.    Background

On January 4, 2009, Mr. McWillie filed an application for supplemental security income, alleging disability beginning January 1, 2008.  (AR at 32).  Mr. McWillie's application states that he is disabled from the pain and functional limitations caused by fractures to his right

---

[1]  20 C.F.R. pt. 404, subpt. P, app. 1.

femur, tibia, and fibula. (Doc. 18 at 1). The claim was denied on May 16, 2008 and also upon reconsideration on July 10, 2008. (*Id.*). Mr. McWillie filed his request for a hearing on August 21, 2008; the hearing occurred on January 19, 2010. (*Id.*) Mr. McWillie and Mary Diane Weber, an impartial vocational expert, testified at the hearing. (*Id.*). The ALJ issued his opinion finding that Mr. McWillie is not disabled under § 1614(a)(3)(A) of the Social Security Act on December 6, 2010. (AR at 40).

a. *Medical Evidence*

On November 4, 2007, Mr. McWillie was admitted to the hospital after a fall from a height of three stories. (*Id.* at 202). In the fall, Mr. McWillie injured his femur, tibia, and fibula, requiring surgery to fix his right femur, fibular, and tibia fractures. (*Id.* at 193, 196). His ankle was also injured in the fall. (*Id.* at 223). Mr. McWillie was in the hospital for twenty days, during which he also suffered from tachycardia and dizziness, which complicated his ability to recover from the leg injuries. (*Id.* at 193). By the time Mr. McWillie was discharged, he had made progress with physical and occupational therapy; he was able to walk 250 feet twice on the day he was discharged. (*Id.*). The physical and occupational therapists felt that he was "independently functional in all regards except [he] needs to take slight precaution with descending stairs." (*Id.* at 193). His tachycardia was attributed to dehydration with orthostasis; to treat it, Mr. McWillie's medication was changed, he was hydrated, and he received a blood transfusion, after which he felt better and was able to sit up and walk around with no complaints. (*Id.* at 194). On discharge, Mr. McWillie had an appointment for follow-up in December and prescriptions for pain, insomnia, and hypertension medications. (*Id.*).

A clinic note reflects that Mr. McWillie had a follow-up on January 22, 2008. (*Id.* at 196-97). At his appointment, Mr. McWillie stated that he had been non-weightbearing since the

surgery and was experiencing sharp pains in his foot, but no other pain.  (*Id.* at 196).  He also

explained that he had some trouble sleeping on his right hip and asked for some pain

medication to help alleviate any pain at night.  (*Id.*).  The physical examination revealed that

Mr. McWillie had some swelling in his leg.  (*Id.*).  He had intact sensation to "light touch in the

. . . tibial nerve distributions."  (*Id.*). His range of motion was limited because of his cast, but

the x-rays showed good healing.  (*Id.*).  The note also states that his incisions were well

healed.  (*Id.*).  The plan was for Mr. McWillie to slowly increase his weightbearing and follow

up in eight to ten weeks.  (*Id.*).  Mr. McWillie also received a prescription for Vicodin, with a

note that it should be his last prescription from the clinic.  (*Id.*).

On February 11, 2008, Mr. McWillie underwent an examination because his ankle

incision had opened and was causing him pain.  (*Id.* at 227, 256).  The radiologist found no

new abnormalities and Mr. McWillie left the emergency room before the exam was complete.

(*Id.* at 227, 257).  In March 2008, Mr. McWillie had a consult for his four by four centimeter

ankle wound.  (*Id.* at 245).  The notes of the physical examination reflect that there was no

active drainage, erythema, or swelling and that Mr. McWillie had intact sensation to light touch.

(*Id.*).  He also had no pain with range of motion and x-rays showed that there were no changes

from prior exams.  (*Id.*).  Mr. McWillie was told to take ibuprofen and Tylenol as needed, but

that he was too far from the date of his surgery to request further narcotic medications.  (*Id.*).

He was also instructed to weight bear as tolerated with crutches and attend his scheduled

follow-up appointment in April.  (*Id.*).

Mr. McWillie had a follow-up appointment on April 8, 2008, at which he had no

complaints of pain, but it was noted that he had a "right medial ankle ulcer."  (*Id.* at 266).  His

incisions over his hip were healed, but there was a four by three centimeter ankle wound with

minimal serous drainage but no odor or tenderness.  (*Id.*).  The x-rays showed that his ankle

fracture was healing, but not healed, as was his femur fracture.  (*Id.*).  The plan was for Mr. McWillie to continue weight bearing as tolerated on his right leg and to watch for signs of infection in his ankle; he was given a prescription for an antibiotic because of the drainage.  (*Id.*).  Mr. McWillie returned on July 29, 2008 for an appointment with Dr. Gehlert.  (*Id.* at 274).  The orthopedist noted that Mr. McWillie was bearing his full weight with a cane, had a slight limp without the cane, and his ankle wound was two by two centimeters with slight serous drainage.  (*Id.*).  Mr. McWillie had good range of motion in his ankle and his foot was grossly neurovascularly intact.  (*Id.*).  Dr. Gehlert noted that his fractures were healing well and that Mr. McWillie was to wean off the cane to encourage complete healing of the bones.  (*Id.*).  He was also sent to wound care for a few visits and prescribed Ambien for sleeping.  (*Id.*).

On September 4, 2008, Mr. McWillie saw Dr. Binder who remarked that Mr. McWillie had not pursued his diagnosis of hypertension with a primary care provider and that he had a non-healing lesion on his right ankle.  (*Id.* at 271).  Dr. Binder also noted that Mr. McWillie was hit by a car in 1992, and suffered bilateral leg fractures.  (*Id.*).

On November 24, 2008, Dr. Augustine Chavez saw Mr. McWillie.  (*Id.* at 286).  The clinic note states that Mr. McWillie continued to have pain in his right ankle and that the wound was slow to heal.  (*Id.*).  The ankle wound was a three by four centimeter scab with some hyperpigmentation surrounding it, but no erythema and a very mild amount of serousanginous drainage.  (*Id.*).  Dr. Chavez referred Mr. McWillie to outpatient rehab for wound care and to x-ray to rule out osteomyelitis; the current regimen for hypertension was to be continued.  (*Id.*).  Dr. Chavez also noted that Mr. McWillie binge drinks on weekends, uses recreational marijuana, and smokes half a pack of cigarettes a day.  (*Id.*).  Dr. Chavez also completed a Provider's Statement for the New Mexico Department of Human Services Income Support Division that stated that Mr. McWillie had limited weight bearing on his right ankle, that he had

a large healing wound on his right ankle, and that the anticipated duration of his inability to work was undetermined. (*Id.* at 285). X-rays taken on December 5, 2008 did not show a significant interval change from those taken in April. (*Id.* at 280).

On December 24, 2008, Mr. McWillie was treated for gastritis, prescribed Pepcid and Reglan, and discharged the same day. (*Id.* at 295, 299, 302). Mr. McWillie met with Dr. Binder again on May 1, 2009. (*Id.* at 338). Dr. Binder noted that Mr. McWillie had not been seen by a primary care physician for six months and missed a scheduled orthopedics appointment from last September. (*Id.*). He also noted that Mr. McWillie had decreased his drinking. (*Id.*).

A clinic note from Mr. McWillie's appointment with Dr. Finucane on September 11, 2009, indicates that Mr. McWillie had mild nonpitting edema on his right ankle and decreased range of motion because of pain. (*Id.* at 335). Mr. McWillie reported that he takes ibuprofen, which does not help, and that hydrocodone helps the most. (*Id.*). Dr. Finucane wrote that his hypertension did not warrant medication but that Mr. McWillie should decrease the salt in his diet and begin working out with his upper body. (*Id.* at 335-36). She also referred him to physical therapy and prescribed ibuprofen, tramadol, and Vicodon. (*Id.* at 336).

Mr. McWillie saw a physical therapist on November 12, 2009. (*Id.* at 326). He reported that he has constant pain in his thigh and back, rated at 5-6/10. (*Id.*). The pain is exacerbated when he is lying on his right side or if he walks longer than twenty minutes; the pain also interrupts his sleep several times a night. (*Id.*). Mr. McWillie also reported that he develops a limp by mid-afternoon on most days and that he finds it difficult to get in and out of low chairs. (*Id.*). The report shows that his cervical range of motion was within normal limits, as was his trunk range of motion. (*Id.*). His knee range of motion was also normal; the strength of the hip

flexors bilaterally was 5+/5 and the knee extension was 5- on the right and 5+ on the left.  (*Id.*).
The report states that when standing, Mr. McWillie bears his weight on his left leg and has a
slow gait cadence.  (*Id.*).  The plan was to have physical therapy once a week for six weeks.
(*Id.*).

On January 1, 2010, Mr. McWillie was seen in the emergency room for chest pains
after consuming alcohol, marijuana, and cocaine.  (*Id.* at 322).  No acute cardiopulmonary
disease was detected.  (*Id.* at 316).  In April 2010, Dr. Finucane completed a Provider's
Statement for the New Mexico Department of Human Services Income Support Division.  (*Id.*
at 343).  She stated that the anticipated duration of Mr. McWillie's inability to work was
indefinite and that he was unable to stand for long periods of time and could not walk three
street blocks.  (*Id.*).

Elva Montoya, a consultant for the Social Security Administration, completed a Physical
Residual Functional Capacity Assessment of Mr. McWillie on May 14, 2008.  (*Id.* at 235-242).
The assessment indicated that Mr. McWillie could occasionally lift a maximum of twenty
pounds and frequently lift a maximum of ten pounds.  (*Id.* at 236).  He could stand or walk with
normal breaks for a total of six hours in an eight hour workday; he could also sit for a total of
six hours in an eight hour workday.  (*Id.*). Dr. Montoya's assessment indicated that Mr.
McWillie had no limitations on pushing or pulling.  (*Id.*).  Also, Dr. Montoya wrote that Mr.
McWillie "should be capable of this RFC 12 months after the date of injury."  (*Id.*).  The
assessment also listed that there were no postural, manipulative, visual, communicative, or
environmental limitations. (*Id.* at 237-39).  Dr. Edward Bocian reviewed Mr. McWillie's medical
records upon reconsideration of his disability determination.  (*Id.* at 270).  He found that the
additional medical records, which included notes and x-rays from Mr. McWillie's April 2008
appointment, did not alter the findings of Dr. Montoya's RFC Assessment.  (*Id.*).

b.  *Testimony at the Hearing*

Mr. McWillie testified at the hearing before the ALJ.  (*Id.* at 54-74).  He explained that he had lost ten pounds over the last two years; according to doctors, this was due to lack of physical activity.  (*Id.* at 54).  Mr. McWillie stated that he had a driver's license and does not typically drive, but drove the short distance from his home to the hearing.  (*Id.* at 54-55).  He also stated that he had completed his education through the eighth grade and had attempted to obtain a GED diploma, but missing two math problems caused him to fail it; he started studying for it a second time but did not take it again.  (*Id.* at 55).  When asked about his work history, Mr. McWillie testified that his last employment was a temporary job with a paper company in 2007.  (*Id.* at 56).

Mr. McWillie testified that, although his doctor did not prescribe a cane, he used one upon the doctor's suggestion.  (*Id.* at 57).  He explained that two or three hours into his day, Mr. McWillie found it difficult to put weight on his right side and the cane is helpful when he is walking or has to climb stairs.  (*Id.*).  Mr. McWillie also testified that he goes to the South East Clinic every two months and is scheduled for physical therapy in between those visits.  (*Id.* at 58).  He went to physical therapy approximately five times in November and December 2009 for his hip and ankle, which he found helpful.  (*Id.*).  Mr. McWillie explained that the doctors were not sure why he continued to have pain and could not bear weight on his right leg, though he has gotten x-rays.  (*Id.* at 59).  He further testified that doctors had discussed another surgery as a possibility.  (*Id.* at 59).  The physical therapist suggested that Mr. McWillie use a neck pillow, a wedge pillow between his knees while sleeping, and elevate his feet, all of which help him a lot.  (*Id.* at 59-60).  Mr. McWillie testified that he feels a strain in his back which is connected to the pain in his hip.  (*Id.* at 60-61).  He explained his limp prevents him from lifting things.  (*Id.* at 61).

Mr. McWillie testified that he lives with a friend in an apartment.  (*Id.*).  On mornings when Mr. McWillie wakes up lying on his right side, his friend has to help him roll over to get out of bed.  (*Id.* at 62).  Sometimes Mr. McWillie needs his friend's assistance to balance while putting on his pants or shoes, otherwise he must sit down to put on his pants.  (*Id.* at 62).  He must also brace himself getting in and out of the shower.  (*Id.* at 72).  Mr. McWillie stated that he prepares his own meals, but does not do his own laundry.  (*Id.* at 62-63).  He does help with cleaning the apartment, but does not perform any tasks that require bending.  (*Id.* at 63).  Mr. McWillie testified that he goes grocery shopping once a week; he explained that when he arrives he feels fine but that by the time he is checking out, he does not "even want to walk to the car." (*Id.* at 63, 70).  He also said that he uses an electric cart at the store and one of his children usually helps him lift items.  (*Id.* at 70).

While at home, Mr. Willie spends much of his time in a reclining position, and spends time watching television and writing songs, but does not record his songs any more, nor is he able to play drums any longer because of the pain in his ankle.  (*Id.* at 63-65, 68, 72).  He also testified that he drinks about once a week, a decrease from the amount he typically consumed previously.  (*Id.* at 67).  Mr. McWillie stated that he cannot sit in one position through an entire movie.  (*Id.* at 68).

When asked about his medications, Mr. McWillie testified that he took hydrocodone and tramadol.  (*Id.* at 69).  Among the side effects that he experiences from these medications are headaches, dizziness, stomach cramps, and drowsiness.  (*Id.*).  The medications do help him walk by taking away the pain.  (*Id.* at 69-70).  He also testified that he hears static noises in his head and occasionally sees things that do not exist, such as a cat walking through the room even though he does not own a cat.  (*Id.* at 72-73).  His doctors told him these were side effects of his painkillers.  (*Id.* at 73).

Ms. Diane Weber, a vocational expert, also testified at the hearing.  (*Id.* at 74-85).  The ALJ asked Ms. Weber to imagine a hypothetical individual the same age as Mr. McWillie, with his educational and work history who can perform work at the light exertional level, but using a cane in his non-dominant hand.  (*Id.* at 76).  Ms. Weber testified that some employers might not like the use of the cane on a permanent basis, but that some of the jobs available at the light exertional level in unskilled work would be a food checker in cafeteria setting; she explained that the number of these jobs available for someone using a cane would be approximately 500,000 nationally and 5,000 regionally.  (*Id.* at 78-79).  She also stated that the individual could potentially work as a gate guard and there are 1,032,260 of these jobs nationally and 3,500 in New Mexico.  (*Id.* at 79).  Another possible job – laundry folder – is unskilled; there are 499,870 jobs nationally and 2,240 in New Mexico.  (*Id.* at 79).

In the next hypothetical, the ALJ asked Ms. Weber to assume the individual needed to use a foot rest approximately two feet high.  (*Id.* at 80).  Ms. Weber testified that this would be a modification to the job and it would depend on the employer as to whether a foot rest could be consistently provided; most likely this modification would reduce the jobs available.  (*Id.*).  Ms. Weber stated that this modification would eliminate the gate guard position as a possibility, but that the individual could still be a laundry folder.  (*Id.*).  However, she added that there were no statistics available on how many laundry folder jobs would be available but that based on her opinion, this kind of job is probably something that could be performed by an individual with the stated modifications. (*Id.* at 81).  Ms. Weber explained that the job is unskilled, though, and there is generally less flexibility in the job of laundry folder.  (*Id.* at 81-82).  She also testified that an individual performing the job of laundry folder might need to carry things or push them from one place to another and that performing the job in a seated position might affect the individual's productivity.  (*Id.* at 83-85).

For the last hypothetical, the ALJ asked Ms. Weber whether there were jobs available in the national and regional economy for an individual who was limited to unskilled work involving only simple tasks, used a cane with his non-dominant hand, and needed a foot rest. (*Id.* at 82). In response, she stated "probably not," adding that a foot rest would be considered a straight modification and would not be considered competitive. (*Id.*).

### c. The ALJ's Decision

At the first step in the sequential evaluation process, the ALJ found that Mr. McWillie had not engaged in substantial gainful activity since January 4, 2008. (*Id.* at 34). At step two, the ALJ found that Mr. McWillie had the following severe impairments: status-post right leg, hip, and ankle injuries. (*Id.*). The ALJ also found that the other impairments alleged by Mr. McWillie, alcohol use, alcoholic gastritis, and high blood pressure, were non-severe impairments. (*Id.*). The ALJ noted that Mr. McWillie had decreased his alcohol consumption from use on a daily basis to once a week. (*Id.*). Regarding the gastritis, the ALJ stated that Mr. McWillie was seen at the emergency room for intermittent abdominal pain and vomiting. (*Id.* at 34-35). The clinical impression was gastritis, vomiting, and dehydration; Mr. McWillie was treated with Pepcid and Reglan medications and released the same day. (*Id.* at 35). The ALJ explained that a clinic note from November 24, 2008 showed that Mr. McWillie's hypertension was well-controlled with medication. (*Id.* at 34). However, at an examination on September 11, 2009, Mr. McWillie said that he had not taken the prescribed medication since the end of 2008. (*Id.*).

At step three, the ALJ found that Mr. McWillie did not have an impairment, or combination of impairments, that meets or equals one of the impairments in the Listings. He

concluded that Mr. McWillie does not satisfy the "listing-level criteria to be presumed disabled as demonstrated by the medical evidence." (*Id.* at 35).

Before reaching step four, the ALJ determined that Mr. McWillie had the residual functional capacity ("RFC") to perform light work with two limitations: he must be permitted to use a cane as necessary with his non-dominant right hand and that he must, as needed, be able to use a two foot high foot rest to raise his right leg and foot. (*Id.*). The ALJ found that Mr. McWillie's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (*Id.* at 36). He also found that Mr. McWillie's statements about the "intensity, persistence and limiting effects of these symptoms are credible to the extent they are consistent with the above residual functional capacity assessment." (*Id.*).

In making his RFC determination, the ALJ discussed Mr. McWillie's testimony at the hearing and his medical records. (*Id.* at 35-39). The ALJ gave significant weight to the agency medical consultants who determined that Mr. McWillie is able to perform light level work. (*Id.* at 38). He adopted their opinion, stating that the RFC also included the limitations that Mr. McWillie cannot stand for long periods of time or walk three street blocks, as recommended by Dr. Finucane in her Provider Statement. (*Id.*). The ALJ also stated that Mr. McWillie's medical records reveal that the prescribed medications have been relatively effective for controlling his symptoms and that Mr. McWillie testified that raising his feet and using a neck pillow helped with his pain. (*Id.*). The ALJ also found that Mr. McWillie "described daily activities which are not as limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (*Id.* at 39). The ALJ stated that Mr. McWillie testified that "he prepares his meals, he goes grocery shopping, he watches television, and that he writes songs." (*Id.*). Ultimately, the ALJ found that the evidence did not show any significant limitations that would prevent Mr.

McWillie from engaging in work-related activities that are consistent with the ALJ's RFC assessment. (*Id.*).

At step four, the ALJ found that Mr. McWillie had no past relevant work, so the analysis continued to the fifth step. At step five, the ALJ concluded that, considering Mr. McWillie's age, education, work experience, and RFC, jobs existed in the national economy that Mr. McWillie could perform. (*Id.*). The ALJ recognized that Mr. McWillie's ability to perform all or substantially all of the requirements of the full range of light work was impeded by additional limitations. In his decision, he wrote that "[t]o determine the extent to which these limitations erode the unskilled light occupational base, I asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity." (*Id.* at 39-40). Based on the vocational expert's response that an individual with these characteristics would be able to work as laundry folder, a job that is considered light and unskilled work, the ALJ found that Mr. McWillie is not disabled. (*Id.* at 40).

## IV. Analysis

Mr. McWillie claims that the RFC contains reversible error and that the ALJ's finding that Mr. McWillie can perform other jobs is error. (Doc. 18 at 7-12). Mr. McWillie alleges that the ALJ violated the treating physician rule by failing to explain how the RFC is consistent with Dr. Finucane's statements about Mr. McWillie's physical limitations. (*Id.* at 8). Mr. McWillie also alleges that the ALJ made incorrect findings related to Mr. McWillie's credibility and used these incorrect findings to find the RFC. (*Id.* at 9). Finally, Mr. McWillie challenges the ALJ's finding that Mr. McWillie can perform other jobs. (*Id.* at 11).

*a.  Treating Physician Rule*

Social Security regulations require that, in determining disability, the opinions of treating physicians be given controlling weight when those opinions are supported by the medical evidence and are consistent with the record; this is known as the "treating physician rule."  20 C.F.R. § 404.1527(d)(2); *Langley*, 373 F.3d at 1119.  The idea is that a treating physician provides a "unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations," and therefore, a treating physician's opinion merits controlling weight.  *Doyal*, 331 F.3d at 762.

Treating physician opinions – in order to receive controlling weight – must be both supported by medical evidence and consistent with the record.  If not, the opinions may not merit *controlling weight* but still receive *deference* and must be weighed using the following six factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003); *see* 20 C.F.R. § 404.1527(c)-(d). Not every factor is applicable in every case, however, and all six factors should not be seen as absolutely necessary.  What is absolutely necessary, though, is that the ALJ give good reasons – reasons that are "sufficiently specific to [be] clear to any subsequent reviewers" – for

the weight that he ultimately assigns to the opinions.  *Langley*, 373 F.3d at 1119; 20 C.F.R. §

404.1527(d)(2); *see also Branum v. Barnhart*, 385 F.3d 1268, 1275 (10th Cir. 2004).

 In this case, Mr. McWillie asserts that the ALJ determined that he could perform light

work with limitations, but incorrectly stated that this determination included the functional

limitations recommended by Dr. Finucane.  (Doc. 18 at 7-8).  The regulations explain that light

work involves

> lifting no more than 20 pounds at a time with frequent lifting or carrying of
> objects weighing up to 10 pounds. Even though the weight lifted may be very
> little, a job is in this category when it requires a good deal of walking or standing,
> or when it involves sitting most of the time with some pushing and pulling of arm
> or leg controls. To be considered capable of performing a full or wide range of
> light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 416.967(b).  Dr. Finucane specifically stated that Mr. McWillie could not stand for

long periods of time and could not walk three street blocks.  (AR at 38, 343).  Although the ALJ

stated the RFC determination included Dr. Finucane's recommended functional limitations,

and the RFC did contain the limitations that Mr. McWillie be able to use a cane and a footrest,

these limitations are not consistent with being able to do "a good deal of walking or standing,"

as required of one performing light work.  *See* 20 C.F.R. § 416.967(b).  Therefore, the ALJ did

not make an RFC determination consistent with the treating physician's opinion.

 When an ALJ does not give controlling weight to a treating physician's opinion, he must

make a finding that the opinion is not supported by medical evidence or that it is not consistent

with the record.  *See Watkins*, 350 F.3d at 1301.  Because the ALJ stated, incorrectly, that the

RFC included Dr. Finucane's recommendations, he did not make these findings.

 The Commissioner contends that Dr. Finucane's statement is not entitled to controlling

weight because it is essentially a disability opinion.  (Doc. 20 at 5).  For support, he cites

*Balthrop v. Barnhart*, 116 Fed. Appx 929, 932 (10th Cir. 2004).  However, the physician's

statement at issue in that case is distinguishable because it stated that the patient was "totally disabled and unable to be gainfully employed," but said nothing about the patient's functional impairments. *Balthrop*, 116 Fed. App'x. at 932. In contrast, the only part of Dr. Finucane's statement to which the ALJ referred was her summary of Mr. McWillie's functional limitations.

The ALJ failed to apply the correct legal standards in his treatment of the treating phsician's opinion and, therefore, the decision must be reversed and remanded. *See Watkins*, 350 F.3d at 1301.

> *b. The ALJ's Credibility Finding*

Mr. McWillie asserts that the ALJ made factually incorrect findings relating to Mr. McWillie's credibility, which were then used to determine Mr. McWillie's RFC. (Doc. 18 at 9-11). In particular, Mr. McWillie claims that the ALJ's finding that Mr. McWillie's daily activities were not as limited as one would expect given the complaints of disabling symptoms and limitations was an inaccurate representation of Mr. McWillie's actual testimony. The Commissioner asserts that the ALJ's credibility findings are entitled to deference and that the ALJ is not required to perform a factor-by-factor review of the evidence. (Doc. 20 at 7-8).

A credibility determination is "the province of the finder of fact." *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995). However, an ALJ's findings regarding a claimant's credibility "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *McGoffin v. Barnhart*, 288 F.3d 1248, 1254 (10th Cir. 2002). Boilerplate language in the absence of a thorough analysis cannot support an ALJ's credibility determination. *Qualls v. Astrue,* 428 Fed. App'x 841, 846. (10th Cir. 2011). While the ALJ does not necessarily need to engage in a formalistic factor-by-factor analysis of the evidence, he must do more than "simply recite the general factors he considered without referring to any specific evidence." *Id.* at 846 (internal quotations omitted).

In this case, the ALJ made two statements about Mr. McWillie's credibility.  First, he wrote that "claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are credible to the extent they are consistent with the above residual functional capacity assessment."  (AR at 36).  The ALJ also found that "claimant has described daily activities which are not as limited to the extent one would expect, given the complaints of disabling symptoms and limitations.  The claimant testified that he prepares meals, he goes grocery shopping, he watches television, and he writes songs." (*Id.* at 39).  The ALJ also mentioned Mr. McWillie's physical therapy results and his testimony that medication takes away the pain, while elevating his feet and using a neck pillow also alleviates some pain.  (*Id.* at 38-39).  While the ALJ is not required to explain every factor in his analysis of the evidence, his decision contained only conclusory statements about his credibility findings.

Although he mentioned it just before he discussed Mr. McWillie's credibility, the ALJ did not explain how Mr. McWillie's testimony that medication helped his pain affected the credibility determination.  It appears that the ALJ felt that Mr. McWillie's daily activities suggested that he was not in as much pain as he claimed, however, it is hard to understand why the ALJ felt that watching television and writing songs, sedentary activities that Mr. McWillie can do while medicated and sitting down with a footrest and neck pillow, indicate that he perform light work.  *See Berryhill v. Barnhart,* 64 Fed. App'x. 196, 200 (10th Cir. 2003) (finding that minimal activities such as watching television, washing dishes, and grocery shopping do not establish that one can work consistently).  Moreover, Mr. McWillie testified that he uses an electric cart to move around the grocery store and his children helped with lifting.  (AR at 70).  The ALJ makes no attempt to address these limitations on Mr. McWillie's daily activities.  Therefore, this case should be remanded for credibility findings that are closely linked to the evidence in the record.

   c.  *The ALJ's Finding That Mr. McWillie Can Perform Other Jobs*

Mr. McWillie claims that the ALJ incorrectly found that he could perform other jobs.

(Doc. 18 at 11-12).  Specifically, Mr. McWillie argues that the ALJ did not properly evaluate the

Vocational Expert's responses to all of the hypotheticals posed to her.  (Doc. 18 at 11-12).

The Commissioner argues that the ALJ did ask the Vocational Expert a hypothetical question

that included Mr. McWillie's RFC and the additional limitations of using a cane with his non-

dominant hand and a foot rest as needed.  (Doc. 20 at 6-7).

At the fifth step in the sequential evaluation process, the Commissioner must

demonstrate that a claimant retains the residual functional capacity to perform work that is

available in the national economy.  *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988);

*Groga*n, 319 F.3d at 1261.  A vocational expert's testimony may be used to establish the

existence of jobs in the national economy.  *See Hargis v. Sullivan*, 945 F.2d 1482, 1491 (10th

Cir. 1991).  However, "[t]estimony elicited by hypothetical questions that do not relate with

precision all of a claimant's impairments cannot constitute substantial evidence to support the

[ALJ's] decision."  *Id.* at 1492.

In evaluating whether significant numbers of jobs are available for a claimant with a

certain RFC, the factors that should be considered include "the level of claimant's disability; the

reliability of the vocational expert's testimony; the distance claimant is capable of travelling to

engage in the assigned work; the isolated nature of the jobs; the types and availability of such

work, and so on."  *Trimiar v. Sullivan*, 966 F.2d 1326, 1330 (10th Cir. 1992) (internal

quotations omitted).  "The decision should ultimately be left to the [ALJ's] common sense in

weighing the statutory language as applied to a particular claimant's factual situation." *Id.* at

1330.

Here, the ALJ's decision correctly stated that the ALJ must determine the extent to

which Mr. McWillie's limitations eroded "the unskilled light occupational base."  (AR at 39).

The ALJ then stated that the vocational expert testified that an individual with the claimant's age, education, work experience, and RFC could perform the requirements of a laundry folder, a job considered light and unskilled; there are 499,870 of these jobs available in the national economy and 2,240 available in the regional economy.  (*Id.* at 39-40).  However, this testimony actually came in response to the first hypothetical, which was about an individual with Mr. McWillie's age, education, work history, and a need to use a cane in his non-dominant hand (S*ee id.* at 78-79); in his opinion, the ALJ did not address the vocational expert's testimony to the hypotheticals posed that included Mr. McWillie's specific limitations that included the need to use a cane *and* a footrest.

When the vocational expert was asked whether jobs were available for an individual who had all of Mr. McWillie's limitations, "including needing to use a foot rest on [an] as-needed basis, but the individual was limited to unskilled work involving only simply tasks," the vocational expert responded "probably not."  (*Id*  at 82).  Although the vocational expert did not explicitly state that there were no jobs available that an individual with all of Mr. McWillie's limitations could perform, she was unable to offer any statistics and stated that employers are not very flexible for employees in an unskilled job that need permanent modifications.  (*Id*  at 81-85).  The ALJ did not discuss the vocational expert's additional testimony at all, relying only on her answers to hypotheticals that did not include all of Mr. McWillie's limitations. Addressing the more relevant hypotheticals, the vocational expert was unable to affirmatively say that any jobs were available in the national or regional economy.  The Commissioner did not meet his burden of demonstrating that jobs exist for an individual with Mr. McWillie's residual functional capacity and the additional limitations that the ALJ determined he had. Therefore, the ALJ's decision is not supported by substantial evidence and must be reversed and remanded for additional findings.

**V.     Conclusion**

        **IT IS THEREFORE ORDERED** that Mr. McWillie's *Motion to Reverse and Remand for*

*a Rehearing, With Supporting Memorandum*, (Doc. 18) be **GRANTED** and that this case be

**REMANDED** to the Commissioner for further proceedings consistent with this Memorandum

Opinion and Order.


_____
        THE HONORABLE CARMEN E. GARZA
        UNITED STATES MAGISTRATE JUDGE